## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| CONTINENTALAFA DISPENSING COMPANY, et al., | ) ) ) ) ) | Case No. 08-45921<br>Chapter 11 |
| Debtors. | ) |  |

## FIRST AMENDED AND MODIFIED DISCLOSURE STATEMENT

The Official Committee of Unsecured Creditors hereby submits its Disclosure Statement in support of its proposed Plan of Liquidation.

## DISCLAIMER

THIS DISCLOSURE STATEMENT AND ITS RELATED DOCUMENTS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH SOLICITATION OF VOTES ACCEPTING THE PLAN OF LIQUIDATION (THE "PLAN") PROPOSED BY THE COMMITTEE. NO REPRESENTATIONS HAVE BEEN AUTHORIZED BY THE BANKRUPTCY COURT CONCERNING THE DEBTORS, THEIR BUSINESS OPERATIONS OR THE VALUE OF THE ASSETS, EXCEPT AS EXPRESSLY SET FORTH IN THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE CAREFUL AND DETAILED REVIEW OF THE PLAN, AND OF RELEVANT STATUTES, DOCUMENTS, AND FINANCIAL INFORMATION. THE DISCLOSURE STATEMENT IS INTENDED ONLY TO AID SUCH A REVIEW, AND IS QUALIFIED BY THE PROVISIONS OF THE ATTACHED PLAN, AS MAY LATER BE AMENDED.

CREDITORS AND EQUITYHOLDERS ARE ENCOURAGED TO REVIEW THE PLAN IN ITS ENTIRETY AND CAREFULLY READ THE DISCLOSURE STATEMENT, INCLUDING ALL ATTACHMENTS, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.

THE DISCLOSURE STATEMENT CONTAINS INFORMATION BELIEVED TO BE CURRENT AS OF ITS DATE, BUT IS NOT WARRANTED OR REPRESENTED TO BE ACCURATE AS OF ANY SUBSEQUENT TIME. THE COMMITTEE DOES NOT WARRANT THAT THE INFORMATION IN THE DISCLOSURE STATEMENT (WHICH IS BASED ON INFORMATION FROM THE DEBTORS AND THIRD PARTIES) IS WITHOUT MATERIAL INACCURACY OR OMISSION.

THE SOLICITATION PERIOD FOR VOTES ON THE PLAN EXPIRES AT 5:00 P.M. ON SEPTEMBER 8, 2009 (ST. LOUIS TIME) (THE "VOTING DEADLINE"). TO BE COUNTED, THE BALLOTS MUST BE PHYSICALLY RECEIVED ON OR BEFORE THE VOTING DEADLINE. BALLOTS SHALL NOT BE ACCEPTED VIA FAX OR EMAIL. A CONFIRMATION HEARING SHALL BE HELD AT 2 P.M. ON SEPTEMBER 15, 2009 (ST. LOUIS TIME).

THE DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE. IT IS NOT NECESSARILY IN ACCORDANCE WITH STATE OR FEDERAL SECURITIES LAWS, OR OTHER NON-BANKRUPTCY LAWS. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED

386763.3

OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION, WHICH HAS NOT JUDGED THE ACCURACY OR ADEQUACY OF ANY STATEMENTS IN THIS DOCUMENT. THE DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. EACH PARTY IN INTEREST SHOULD SEEK INDEPENDENT COUNSEL AS TO ANY MATTERS INVOLVING THE SOLICITATION, THE PLAN, AND TRANSACTIONS CONTEMPLATED IN THE PLAN OR DISCLOSURE STATEMENT.

## I.    INTRODUCTION

The Committee is providing this Disclosure Statement to all of the Debtors' known creditors to provide, to the extent practicable under the circumstances, adequate information to creditors concerning Committee's Plan of Liquidation (the "Plan"), which is attached as Exhibit A. If the terms of this Disclosure Statement and the Plan differ, the Plan terms shall govern.

Creditors may vote on the Plan by completing and mailing the ballot that accompanies the Plan. Your vote is important. The Plan may be confirmed by the Bankruptcy Court if it is accepted by creditors that hold two-thirds in the amount and more than one-half in number of Allowed Claims in a voting Class. If the required acceptances are not received, the Court may nevertheless approve the Plan if the Plan provides fair and equitable treatment to the class rejecting the Plan and meets other requirements of Section 1129(b) of the Bankruptcy Code.

*Your vote is important.* Without confirmation of the Plan, settlements whose effectiveness are contingent on the confirmation and effectiveness of the Plan will be jeopardized. The Committee estimates that the Plan will provide a distribution on general

386763.3

unsecured claims of at least 10 percent, although the timing and amount of sale proceeds and recoveries on causes of actions cannot be predicted with certainty..  In a liquidation under Chapter 7 of the Bankruptcy Code, general unsecured creditors would probably receive nothing.

Capitalized words in this Disclosure Statement are defined in the Plan.

## II.  BACKGROUND

A.  The Chapter 11 Cases.

In the years preceding its bankruptcy filing, ContinentalAFA Dispensing Company ("CAFA") reported that its gross profit, excluding depreciation, declined from $20.2 million in 2004 to just $1 million in 2007. The loss of major customers, foreign competition, and higher costs for raw materials decreased the Debtors' profitability further.

On August 7, 2008, (the "Petition Date") the Debtors (consisting of CAFA and its two wholly owned subsidiaries, AFA Products, Inc., and Continental Sprayers International, Inc.) filed petitions for relief under Chapter 11 of title 11 of the United Stated Code (the "Bankruptcy Code").  Pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are managing their properties as debtors in possession.  Prior to the Petition Date, the Debtors were designers, manufacturers and suppliers of high quality, plastic trigger sprayers and other liquid dispensing technologies and systems for major consumer product companies and industrial markets.  The Debtors have no current operations; instead, they are liquidating all of their assets under Chapter 11.

On or about August 21, 2008, the United States Trustee for the Eastern District of Missouri appointed a statutory creditors' committee (the "Committee") in the Debtors' Chapter

11 cases. The Committee retained the law firm of Spencer Fane Britt & Browne LLP as its legal counsel, and RubinBrown LLP as its financial advisor.

B.   Harbinger's Secured Claims And The Financing Orders.

At the Petition Date, two investment funds, Harbinger Capital Partners Master Fund I Ltd. and Harbinger Capital Partners Special Situations Fund LP (together, "Harbinger") collectively held approximately $20 million in principal face amount of secured debt (the "Harbinger Debt"). Harbinger also owns 100% of the equity interests in CAFA, which in turn, owns 100% of the equity interests in the remaining Debtors. On August 8, 2008, the Court entered the Interim Order (A) Authorizing Debtors to Obtain Post-Petition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105 and 364(c); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter Into Agreements with Wachovia Capital Finance Corporation (Central), ("Wachovia") in its Capacity as Agent for Itself and Certain Other Lenders (the "Agent"); and (D) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 [Docket No. 27] (the "Interim Financing Order"), and on September 19, 2008, the Court entered the Final Order (A) Authorizing Debtors to Obtain Post-Petition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105 and 364(c); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtors to Enter Into Agreements with Wachovia Capital Finance Corporation (Central), in its Capacity as Agent for Itself and Certain Other Lenders [Docket No. 150] (the "Final Financing Order" and together with the Interim Financing Order, the "Financing Orders"). The Final Financing Order incorporated and approved the Interim Financing Order, except as specifically modified by the

386763.3

Final Financing Order. Final Financing Order at 2. Pursuant to the Financing Orders, the Court reaffirmed the senior secured liens of Harbinger and Wachovia Capital Finance Corporation (Central) ("Wachovia") on substantially all of the Debtors' assets, and in exchange for providing certain financial accommodations to the Debtors, including the use of Cash Collateral (as defined in the Financing Orders), granted Wachovia and Harbinger senior and superpriority liens on the Collateral (as defined in the Financing Orders), subject to limited specific exceptions and other adequate protection. Harbinger's liens were junior in priority only to those of Wachovia. [Docket No. 27] Because Wachovia has now been paid in full, Harbinger holds senior, first-priority liens in substantially all of the Debtors' assets.

As adequate protection for the Debtors' use of Harbinger's Collateral, Harbinger was granted "a replacement lien on and security interest in all Collateral" (the "Replacement Lien"). Interim Financing Order, 2.7.1. To the extent the Replacement Lien is insufficient "to adequately protect against the diminution of Harbinger's interest in the Collateral" Harbinger shall receive an administrative expense claim under 507(b) "in an amount by which such diminution exceeds the value of the Replacement Lien" (the "Harbinger Adequate Protection Claim"). Interim Financing Order, §2.7.2.

Cash currently held by the Debtors is encumbered by Harbinger's liens in accordance with the Bankruptcy Court's approval of the Final Financing Order allowing use of cash collateral and providing superpriority and replacement liens to the lenders. The Final Financing Order recited the liens were valid, perfected and enforceable and not subject to challenge except by the Committee within a specified period.

386763.3

C.    The Debtors' Asset Sales.

The Bankruptcy Court has approved the sale of a large portion of the Debtors' assets since the Case was filed. Substantial assets remain to be liquidated, including causes of action arising under Chapter 5 of the Bankruptcy Code.

From the onset of these cases, the Debtors' have sought to liquidate their assets.  After a full sales and marketing process, the Court approved the sale of a substantial portion of the Debtors' assets to MeadWestvaco Calmar, Inc. ("Calmar") for approximately $ 7.54 million (the "Calmar Sale").  The Debtors' remaining assets include:  plants that housed the Debtors' former manufacturing facilities in Missouri, North Carolina, Connecticut and Costa Rica (the "Real Property"), certain specialized manufacturing equipment that was not sold to Calmar (the "Equipment"), spare parts and plastics (the "Spare Parts"), and various claims and causes of action (the "Actions", and collectively with the foregoing items, the "Remaining Assets"). The Spare Parts are currently being liquidated by professional liquidator Atec, Inc., pursuant to the order approving the retention of Atec [Docket No. 119].

The Bankruptcy Court approved the sale of Debtors' plant site in St. Peters, Missouri, for $4.136 million and approved the sale of Debtor's plant site in Bridgeport, Connecticut, for $1 million.In both instances the sales did not close and the properties continue to be marketed.

The Committee's financial adviser, RubinBrown, has estimated the liquidation proceeds of the remaining estate property, a summary of which is attached as Exhibit B.

386763.3

## III.    SIGNIFICANT CHAPTER 11 LITIGATION

### A.    Committee Action Against Harbinger.

Under the Financing Orders, the Committee had a ninety (90) day period to investigate and challenge the liens of Wachovia and Harbinger (the "Challenge Period"). On November 7, 2008, the Committee filed an adversary proceeding (the "Committee Adversary Proceeding") against Harbinger seeking, inter alia, to recharacterize the Harbinger Debt to an equity contribution, and alternatively, to find that a lien on a portion of the Collateral is invalid as a preference due to a purported delay in the recordation of a mortgage on the Debtors' facility in Forest City, North Carolina.

The Committee timely filed an adversary proceeding against Harbinger, alleging that the Harbinger loans secured by alleged liens should be characterized as equity contributions rather than as secured debt. In early March 2009, Harbinger and the Committee after extensive negotiations agreed to settle the Committee Adversary Proceeding, (the "Committee Settlement") and filed a Rule 9019 motion seeking Court approval of the Settlement, which was orally granted on May 6, 2009. The Committee Settlement is attached as Exhibit C.

The Committee Settlement is contingent upon confirmation and effectiveness of the Plan. The Settlement generally provides for distribution of the Harbinger Collateral Proceeds among Harbinger, the holders of general unsecured claims, and the estates. This will include a $575,000 reserve for administrative expenses accrued from March 2, 2009 through the Effective Date; the next $2.3 million in collateral proceeds (less Harbinger Collateral proceeds previously paid to Harbinger after the Petition Date) will be paid indefeasibly to Harbinger; and the balance of the collateral proceeds would be paid sixty percent (60%) to Harbinger and forty percent (40%) into

386763.3

a segregated fund (the "Collateral Account") held for the benefit of holders of non-priority unsecured claims ("NUCs"), but subject to payment of administrative claims after the $575,000 reserve is exhausted. From proceeds received in excess of $10 million, Harbinger will receive seventy-five percent (75%) and the NUCs will receive twenty-five percent (25%). In addition, Harbinger shall receive a Plan release of all creditor claims related to the Debtor, and would waive all rights to distributions on its estimated $16 million unsecured deficiency claim. The Committee's financial adviser estimates a recovery for NUCs of $2.0 million to $2.4 million, from Harbinger Collateral proceeds, depending upon the amount of administrative costs incurred prior to the Effective Date. The Debtors scheduled approximately $15 million in unsecured claims, not including the Harbinger unsecured claims.

Harbinger had moved to convert this case to one under Chapter 7, alleging continuing losses to the Chapter 11 estates with no realistic prospect of an effective reorganization or liquidation. The motion remains pending, but under the Settlement terms and Plan, will be deemed dismissed on the Effective Date of the Plan. The Settlement will be void *ab initio* if the Plan is not confirmed or if it does not become effective.

B.    Reckitt Benckiser Inc. Litigation

On or about July 2, 2008, just over a month prior to the filing of the Debtors' bankruptcy cases, Reckitt Benckiser, Inc. ("Reckitt") filed a civil action, *Reckitt Benckiser, Inc. v. ContinentalAFA Dispensing Co.,Harbinger Capital Partners G.P., LLC, Harbert Management Corporation, and John Does 1-10,* currently pending in the Superior Court of New Jersey, Case No. L-1971-08 (the "New Jersey Action"). As of the Petition Date, the New Jersey Action was stayed as against CAFA by the automatic stay of 11 U.S.C. §362. This litigation arises from

- 9 -

CAFA's allegedly unlawful breaches and improper termination of a written requirements contract it had with Reckitt, its customer. Reckitt asserted a non-contingent, disputed unliquidated claim in the approximate amount of $11.2 million, which claim is allegedly partially secured in the approximate amount of $2 million by Reckitt's rights of setoff under applicable state law and Section 553 of the Bankruptcy Code.

After Debtors filed for Chapter 11 protection, CAFA filed an adversary proceeding against Reckitt to recover an alleged $1.1 million preferential transfer and collection of a $2.2 million account receivable. Reckitt has filed for relief from the automatic stay to liquidate its claim against CAFA in the New Jersey Action, which was opposed by CAFA and the Committee. On February 4, 2009, Reckitt dismissed CAFA's co-defendants with prejudice in the New Jersey Action. The preference and collection actions brought by CAFA in a Bankruptcy Court adversary proceeding are pending, and Reckitt has brought breach of contract counterclaims against CAFA in the same proceeding.

C.    Class and Individual WARN Act Claims

On August 11, 2008, Joshua Bridges on behalf of a putative class of former employees of the Debtors, filed an adversary proceeding against the Debtors and Harbinger under the Worker Adjustment and Retraining Notice Act, 29 U.S.C. § 2101 et seq., ("WARN Act") alleging the Debtors failed to provide their workers with at least 60 days notice of the closing of Debtors' plants. The Debtors, the Committee and Harbinger filed motions to dismiss, asserting that the putative class claims should be administered through the claims resolution process of 11 U.S.C. § 502 rather than as an adversary proceeding. On December 31, 2008, Bridges filed for certification of the class under Fed. R. Bankr. P. 7023. In April 2009, the Court dismissed the

    386763.3

class action proceedings in favor of claim liquidation procedures under 11 U.S.C. § 502. The Court also ruled that the filing of the adversary proceeding violated the automatic stay in Debtors' cases and the Court extended the automatic stay to Harbinger. The WARN Act Claimants have appealed the order.

Putative class counsel filed an asserted class claim and 270 individual proofs of claim totaling some $8 million. The claims are alleged to be entitled to administrative priority, pursuant to Section 503(b)(1)(A) of the Bankruptcy Code, or priority unsecured status under Section 507(a)(4).

The Debtors, Harbinger, the Committee, and the putative class counsel reached an agreement in principle in early May 2009, ("WARN Settlement") providing for, among other terms, liquidation of all WARN claims, filed and unfiled, capped at $1.5 million, less attorney fees, costs, and premiums as allowed by the Bankruptcy Court; allowance of the group proof of claim for that same amount, certification of the class, and appointment of WARN class counsel. The amount would be funded with $1 million from the Collateral Account established under the Committee's settlement with Harbinger, the first $125,000 of net Avoidance Action proceeds, and the first $125,000 from net Avoidance Action proceeds after $2 million is collected. Harbinger will contribute $250,000 solely from its Collateral proceeds to reach the $1.5 million settlement amount. The WARN Settlement is attached as Exhibit D.

During the Case, the Debtors have settled a number of adversary proceedings. In addition, the Debtors and the Committee entered into a settlement agreements addressing potential preference actions involving William L. Driggers, Sr., Donald Foster and Lewis, Rice

386763.3

& Fingersh, L.C., ("LRF") which were approved by the Court. The settlements are contingent upon the occurrence of the Effective Date. Under the settlement, Driggers and Foster (in exchange for $75,000 payable to the Liquidation Trustee) and LRF will be released from any potential causes of action that the Liquidation Trustee, the Debtors, or the Committee might have against them, including for receipt of preferential payments. In accordance with the settlement, Driggers, Foster, and LRF shall receive a release from all claims by third-parties related to the Debtors pursuant to the Plan.

## IV.    SUBSTANTIVE CONSOLIDATION

Debtors' Chief Financial Officer, Colleen J. Morgan, testified that all three of the Debtors did business under the same name, "ContinentalAFA Dispensing Company," were operated in common, and shared all manufacturing facilities. As a result, the Amended Plan will substantively consolidate the Debtors on the Effective Date of this Plan to avoid further creditor confusion and inefficiency in allowance of claims and making distributions on allowed claims.

Substantive consolidation will treat the Debtors' three Estates as one Estate. Assets and obligations of one Debtor will become the assets and obligations of all the Debtors as a result. Accordingly, a Proof of Claim filed by a Creditor in this Case will be deemed to have been filed against all of the Debtors.

## V.    SUMMARY OF THE PLAN

The Plan provides for the liquidation of Debtors' remaining assets after the Effective Date by a Liquidation Trustee, and distribution of the resulting sale proceeds. In addition, Collateral encumbered by Harbinger liens will be liquidated and proceeds will be distributed in accordance with the terms of the Committee Settlement and WARN Settlement.

386763.3

The Plan, on the Effective Date, will release all claims and causes of action that third parties may hold against Harbinger, their officers, directors, shareholders, employees, agents, and attorneys, in connection with Harbinger's actions or omissions with regard to the Debtors, as required by the Committee Settlement and in consideration for (1) transferring a portion of Harbinger's collateral proceeds to the class of non-priority unsecured creditors; (2) Harbinger's waiver of superpriority claims and priority administrative expense claims that were provided to Harbinger as adequate protection of the value of its secured claims through the Final Financing Order entered by the Bankruptcy Court; and (3) Harbinger's subordinationwaiver of its right to distributions on account of its Class 3 deficiency claims, which are estimated at $16 million. The WARN Settlement provides for the release of all actions pending against the Debtors and Harbinger by former employees related to WARN Act liability.

The Plan provides for the following treatment of claims:

A.      <u>Administrative Expense Priority Claims</u> (including fees and expenses for attorneys and accountants and any post-petition taxes) shall be paid in full on the Effective Date or as soon as practicable thereafter, unless otherwise agreed.  All applications for allowance and payment of administrative claims not previously allowed or disallowed by the Court or required to be filed by a previous date, must be filed within 20 days after the Confirmation Date, or the claims shall be barred.

B.      <u>Fees Specified in 28 U.S.C. § 1930(a)(6)</u> shall be paid on the Effective Date or as soon thereafter as practicable.

C.      <u>Class 1A:  Allowed Secured Claim of Harbinger Capital Partners Master Fund I, Ltd. ("Master Fund")</u>, pursuant to the Committee Settlement, will receive the following

386763.3

treatment in accordance with the Settlement: (i) a total of $575,000 of Harbinger Collateral proceeds shall be reserved for estate administrative expenses through the Effective Date; (ii) including distributions to Harbinger Capital Partners Situations Fund LP ("Situations Fund"), the Master Fund shall be paid the next $2.3 million of Harbinger Collateral proceeds, less funds already received from such proceeds after the Petition Date; (iii) including distributions to Situations Fund, the Master Fund will receive 60% of the next $7.2 million in net proceeds from further sale of the Harbinger Collateral, and 75% thereafter; and (iv) to the extent the collateral proceeds are insufficient to pay Master Fund's Claim in full, the unpaid portion of the Claim shall be a Class 3 general unsecured claim and estimated at $12 million for purposes of voting. Master Fund shall waive distributions on its unsecured claims. This Class is impaired.

D.  Class 1B: Allowed Secured Claim of Harbinger Capital Partners Situations Fund, LP ("Situations Fund"), pursuant to the Committee Settlement, will receive the following treatment: (i) a total of $575,000 of Harbinger Collateral proceeds shall be reserved for estate administrative expenses through the Effective Date; (ii) including distributions to Master Fund, the Situations Fund shall be paid the next $2.3 million of Harbinger Collateral Proceeds, less funds already received from such proceeds after the Petition Date; (iii) including distributions to Master Fund, the Situations Fund shall receive 60% of the next $7.2 million in net proceeds from further sale of the Harbinger Collateral, and 75% thereafter; and (iv) to the extent the collateral proceeds are insufficient to pay the Situations Fund's Claim in full, the unpaid portion of this Claim shall be a Class 3 general unsecured claim and estimated at $4 million for purposes of voting. Situations Fund shall waive distributions on its unsecured claims. This Class is impaired.

386763.3

E.    Class 1C: Allowed Setoff Claim of Reckitt Benckiser Inc., if any, shall be paid in full by offset of funds owed by Reckitt to Debtors, subject to any judgment recovering preferential transfers from Reckitt. Any unsecured portion of the claim, after allowance, will be treated as a Class 3 claim. This claim is disputed and shall be paid only if it is an Allowed Claim. Reckitt's secured claim is impaired.

F.    Class 1D: Allowed Secured Claim of Armin Tool & Manufacturing Company ("Armin"), if any, shall be paid in accordance with the Final Judgment of the Bankruptcy Court in the adversary proceeding seeking to establish the extent, validity, and priority of Armin's asserted common law liens. To the extent the collateral or proceeds thereof are not sufficient to pay Armin's Claim in full, the unpaid portion of the Claim shall be treated as a general unsecured claim upon allowance.   The pending adversary proceeding relating to Armin's common law possessory repairman's lien claims has been tried and is under advisement with the Bankruptcy Court. Armin asserts an oversecured Claim totaling $254,000, plus interest, fees and charges with respect to certain molds and related items that Armin manufactured or repaired for CAFA which Armin possessed on the Petition Date. The Debtor will comply with the Final Order or judgment resolving the Adversary. This claim is disputed and shall be paid only after it is an Allowed Claim. This class is impaired.

G.    Unclassified Priority Tax Claims shall be paid, to the extent funds are available, exclusive of penalties and post-petition interest, (a) on the Effective Date, (b) on the date such Claim becomes due according to contractual, statutory or other terms applicable thereto, (c) as soon as practicable after entry of a Final Order allowing such claim, if the Claim is disputed or if applicable provisions of the Code otherwise require Court approval, or (d) paid over a period not

386763.3

exceeding five (5) years after the Petition Date, in the sole discretion of the Liquidation Trustee. Payment of these claims may depend on the Estate's ability to pay Administrative Claims, including those as yet unliquidated.

Class 2A:  Allowed WARN Act claims shall be allowed as a class proof of claim in the total amount of $1.5 million, less awards of attorneys fees, costs, and premiums. Joshua Bridges, as class representative shall be entitled to cast a class ballot for all WARN claimants in the class sought to be certified at the onset of the bankruptcy case. Individual WARN claims shall be disallowed as duplicative. This class is impaired.

Class 2B: Other Priority Unsecured Claims shall be paid in full to the extent there are funds available: (a) on, or as soon as practicable after, the payment of Administrative Expense Claims and claims of higher payment priority pursuant to Code Section 507; (b) on the date such Claim becomes due according to contractual, statutory, or other terms applicable thereto, or (c) as soon as practicable after entry of a Final Order allowing such Claim, if the claim is disputed or if applicable provisions of the Code otherwise require Court approval. Payment of these claims may depend on the Estate's ability to pay Administrative Claims, including those as yet unliquidated, and shall be paid according to the payment priorities of 11 U.S.C. § 507. Priority Unsecured Claims shall accrue simple interest of five percent (5%) per annum from the date they are Allowed Claims, but shall not be entitled to payment of any other charges, fees or penalties. This class is impaired.

H.  Class 3: General Unsecured Claims shall be paid *pro rata* from remaining estate funds, if any, after payment in full of Allowed Secured Claims, Administrative Expense Priority Claims, U.S. Trustee fees, Priority Tax Claims, and Priority Unsecured Claims.  Harbinger's

386763.3

unsecured deficiency claims shall be included in Class 3 for purposes of Plan voting but shall not be entitled to any distribution on its unsecured claims until all other Allowed Class 3 Claims are paid in full.

In addition to potential distributions from unencumbered estate property, the Liquidation Trustee pursuant to the Committee Settlement, shall deposit in trust a portion of net Harbinger Collateral Proceeds into a Collateral Account for the benefit of holders of Class 3 Claims as Harbinger's Collateral is liquidated, and shall pay a portion of the Harbinger Collateral proceeds to Harbinger on account of its Class 1A and 1B Claims, consistent with the Committee Settlement and the WARN Settlement. The Harbinger Collateral Proceeds deposited by the Liquidation Trustee shall be in addition to any amounts deposited pursuant to the Settlement into the Collateral Account prior to the Effective Date. The Liquidation Trustee shall make *pro rata* distributions from the Collateral Account to holders of Class 3 Allowed Claims, at times and in amounts left to the Liquidation Trustee's reasonable discretion. The Collateral Account shall not be property of the Estate, shall not be subject to attachment by Debtors' creditors, and shall be deemed for all purposes to have been paid directly by Harbinger to holders of Class 3 Allowed Claims from proceeds of Harbinger Collateral. This class is impaired. The Collateral Account shall be available for payment of Administrative Claims and WARN Claims as provided in the Committee Settlement and WARN Settlement.

I. <u>Class 4: Interest of Equity Holders</u> shall be extinguished and shall receive no distribution, unless all Allowed Claims are paid in full.

## VI. MEANS OF IMPLEMENTING THE PLAN

A. The Debtors shall be dissolved and cease to exist on the Effective Date.

386763.3

B.      The Debtors' property, including actions under Chapter 5 of the Bankruptcy Code, shall vest exclusively in a Liquidation Estate, controlled by a Liquidation Trustee. The Liquidation Trustee shall be authorized to sell or otherwise dispose of all property of the Estate, bring actions to avoid transfers, prosecute actions against any entity, including actions originally brought or which could have been brought by the Committee or the Debtors, and with the same standing to sue as the Committee or the Debtors, recover property under Chapter 5 of the Bankruptcy Code, object to claims, and exercise all the rights, powers and duties of a Chapter 11 trustee. The Liquidation Trustee shall make distributions as provided by the Plan. The Liquidation Trustee shall serve without a bond and shall be discharged after filing a final report and obtaining an Order closing the Estate.

C.      The Liquidation Trustee shall be appointed by the Committee with the approval of Harbinger, and in consultation with the Debtors, on or before the Confirmation Hearing for the Plan. A Trust Agreement shall be executed and submitted to the Court for approval. The Liquidation Trustee shall have the right to employ professionals, including attorneys, auctioneers and accountants to assist in discharging his/her responsibilities, and shall have authority to obtain financing to assist in funding liquidation and asset recovery efforts, including prosecuting any causes of action, without seeking approval from the Bankruptcy Court.

The Liquidation Trustee shall execute the Plan, which incorporates the terms of the Committee Settlement and the WARN Settlement. The Liquidation Trustee's fees and expenses and those of professionals retained by the Liquidation Trustee shall be paid in accordance with the Plan and Liquidation Trust Agreement as approved by the Bankruptcy Court.

386763.3

D.     The Committee shall disband and be deemed dissolved on the later of the Effective Date or the date on which the Liquidation Trustee executes the Liquidation Trust Agreement, except that the Committee shall remain in existence to evaluate, object to (if necessary), and appear at the hearing to consider applications for interim and final allowances of compensation and reimbursement of expenses. At the time of the dissolution of the Committee, pending actions brought by the Committee shall vest in the Liquidation Estate, which shall be deemed to have the same standing and right to sue as the Committee.

E.     The Bankruptcy Court shall retain jurisdiction to, among other things, issue judgments in the Avoidance Actions and orders to effectuate the Plan.

F.     The Committee, Committee members, the Debtors, Harbinger, and their agents, employees, professionals, attorneys, plan fiduciaries, officers, and directors shall be released from any liability arising from any act or omission related to the Case.

G.     All unexpired leases and executory contracts not previously assumed by the Debtors are deemed rejected as of the Confirmation Date.

386763.3

H.    THIRD PARTY RELEASES OF LIABILITY

*CONFIRMATION OF THE PLAN SHALL, ON ITS EFFECTIVE DATE, AUTOMATICALLY RELEASE HARBINGER, ITS CURRENT AND FORMER OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, AND ATTORNEYS, FROM ANY AND ALL LIABILITY TO THIRD PARTIES ARISING FROM OR RELATED TO HARBINGER'S TRANSACTIONS OR AFFILIATIONS WITH THE DEBTORS AS EQUITY HOLDER, CREDITOR, BOARD MEMBER, OR OTHERWISE. THE RELEASES PROVIDED IN THE PLAN SPECIFICALLY PROVIDE FOR RELEASES OF LIABILITY ALLEGED AGAINST HARBINGER BY WARN ACT PLAINTIFFS ALLEGING ALTER EGO AND/OR SINGLE EMPLOYER LIABILITY.*

## VII.    FINANCIAL INFORMATION

Debtors currently have virtually no business operations and the Liquidation Trustee shall wind down any business operations post-confirmation. All of Debtors' assets, with the exception of those to be transferred to the Liquidation Estate on the Effective Date, have been liquidated. The liquidation dividend paid to holders of Class 3 general unsecured claims is contingent upon the availability of funds after payment of Allowed Secured Claims, Administrative Expense Priority Claims, U.S. Trustee Fees, Priority Tax Claims and Priority Unsecured Claims.

## VIII.    THE PLAN'S TAX CONSEQUENCES

The implementation of the Plan may have federal, state and local tax consequences to the Debtors and the Debtors' Creditors. This discussion summarizes only certain of the federal income tax consequences associated with the Plan's implementation. No representation or

386763.3

assurance is being made with respect to the tax consequences as described herein. This Disclosure Statement does not constitute and is not intended to constitute either a tax opinion or tax advice. YOU ARE URGED TO CONSULT YOUR OWN TAX ADVISOR CONCERNING YOUR PARTICIPATION IN THE PLAN AND ANY RESULTING TAX CONSEQUENCES. THIS DISCUSSION CANNOT BE USED BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES.

A. <u>Tax Consequences to Debtors</u>. Because the Debtors shall dissolve and cease to exist on the Effective Date, no tax attributes shall remain in existence to be reduced or otherwise adjusted.

B. <u>Tax Consequences to Creditors</u>.

*Gain/Loss on Exchange.* Other than Claims for accrued interest, Creditors shall recognize gain or loss on the actual or constructive exchange of such Creditor's existing Claim(s) for cash and any other consideration received equal to the difference between the amount realized regarding such Claim(s) and the Creditor's tax basis in such Claim(s). Amount realized as to a cash-basis taxpayer shall be equal to the sum of the cash received and the fair market value of all other consideration received. Amount realized as to an accrual-basis taxpayer shall be equal to the sum of the cash received, face amount of any new debt instruments received, and fair market value of the other consideration received, less any amounts allocable to interest, unstated interest or original issue discount.

*Tax Basis and Holding Period of Items Received in Exchange.* The aggregate tax basis shall equal the amount realized in respect of such items (other than amounts allocable to accrued interest). The holding period shall begin on the day following the exchange.

386763.3

*Bad Debt Deduction on Discharge of Claim.* A Creditor who receives no consideration for its Claim under the Plan may be entitled to a bad debt deduction equal in amount to such Creditor's adjusted basis in such Claim. A bad debt deduction is allowable in the taxable year of the Creditor in which a debt becomes wholly worthless. No opinion is being expressed regarding the date or dates on which Claims not paid under the Plan became worthless.

*Receipt of Interest.* Income attributable to accrued but unpaid interest shall be treated as ordinary income. It is irrelevant, in this regard, whether the Creditor's existing Claims are capital assets in its hands. A Creditor who, under its accounting method, was not previously required to include in income accrued but unpaid interest attributable to existing Claims and who exchanges its interest Claim for Cash or other property pursuant to the Plan shall be treated as receiving ordinary interest income to the extent of any consideration so received allocable to such interest, regardless of whether that Creditor realizes an overall gain or loss as a result of the exchange of its existing Claims. A Creditor who had previously included in income accrued but unpaid interest attributable to its existing Claims shall recognize a loss to the extent such accrued but unpaid interest is not satisfied in Full. A Creditor who had previously included in income accrued but unpaid interest attributable to its existing Claims shall recognize a loss to the extent such accrued but unpaid interest is not satisfied in full. For purposes of the above discussion, "accrued" interest means interest which was accrued while the underlying Claim was held by the Creditor. The extent to which consideration distributable under the Plan is allocable to such interest is uncertain.

*Withholding.* The Liquidation Trustee shall withhold any amounts required by law from payments made to Creditors. This may require payments by certain Creditors of the required

386763.3

withholding tax on the non-Cash consideration issuable under the Plan. In addition, Creditors may be required to provide general tax information to the Debtors or to the Liquidation Trustee.

*Taxation of Gain on Sale of Assets and Certain Reserves.* The Internal Revenue Service's position as to characterization of a liquidation trust and of the assets transferred to a liquidation trustee by a debtor is in conflict with the Supreme Court's most recent decision, specifically, as to whether the trust qualifies as a continuation of the bankruptcy estate, a creditor grantor trust, or a debtor grantor trust. However, it is clear, pursuant to I.R.C. § 6012(b)(3), that the trust is responsible for filing corporate returns and reporting gain on any sale of assets for purposes of liquidation.

I.R.C. § 468B(g) provides that escrow accounts, settlement funds or similar funds are subject to taxation. However, the regulations thereunder reserve the tax treatment of settlement funds in bankruptcy. Thus, it is uncertain as to who is responsible for reporting income generated by the reserves formed pursuant to the Plan.

It is possible that the reserves held by the Liquidation Trustee could be treated as a grantor trust for which the creditor beneficiaries are treated as grantors. Consequently, the creditor beneficiaries would be subject to current taxation on the income generated by such reserves. If the reserves are not treated as a grantor trust, they shall be treated as a trust taxable currently as a separate entity on its income. Pursuant to the Plan, the Liquidation Trustee is treated as the assignee of substantially all the Debtors' assets and is responsible for administering the reserves. Therefore, the Liquidation Trustee would be required to file appropriate income tax returns and pay any tax due out of such reserves as a result of any income earned by the reserve principal pursuant to I.R.C. § 6012(b)(3).

386763.3

C.    Tax Consequences to Holders of Equity Interests.  Holders of equity interests in

Debtors that are canceled pursuant to the Plan may be entitled to a worthless stock deduction for

the Holder's tax year in which the Plan is confirmed and becomes effective, unless such

deduction was previously claimed for a prior tax year of the Holder.  A worthless stock

deduction may be a capital loss or an ordinary loss, depending upon the Holder's circumstances.

To substantiate a worthless stock deduction, a Holder generally must show that the stock

possessed some value at the beginning of the tax year and became wholly worthless prior to the

end of such tax year.  No opinion is being expressed with respect to the date upon which stock

became worthless.

## IX.    LIQUIDATION ANALYSIS

The Committee believes liquidation under the Plan will be more beneficial to the

Debtors' creditors than a Chapter 7 liquidation.  The orderly liquidation that has occurred thus

far in the Chapter 11 proceedings has produced sale proceeds in excess of those estimated by

financial professionals prior to the Petition Date. The assets could not have been sold as

profitably in a Chapter 7 case, which the Committee believes would realize substantially less for

the Estate and its creditors, resulting in no possibility of distributions on unsecured claims.

The Committee's informed opinion is that the most effective and cost-efficient

administration of the remaining estate assets would occur through the Liquidation Trustee. The

Committee believes that the sale of the Debtors' remaining assets by the Liquidation Trustee will

generate greater revenue than a Chapter 7 sale because the Liquidation Trustee will be a

professional financial advisor more qualified to oversee the marketing and sale of the real estate

and equipment (including that in Costa Rica). Property in a Chapter 7 case is typically liquidated

386763.3

through quick sales or abandoned, particularly when cash is unavailable to fund an orderly marketing and sale of assets. As a result, the Committee believes liquidation under the Plan will better serve the interests of Debtors' creditors.

In addition, the Plan provides a cost-effective mechanism for implementation of the WARN and Committee Settlements that would not be available in a Chapter 7 case. Absent the occurrence of the Effective Date of the Plan, each of the settlements would become void and the financial benefits to the estate resulting from the settlements would be lost.

The Committee cannot forecast with any precision the amount, if any, to be distributed under the Plan to holders of Class 3 Claims from the Dividend Account because of uncertainties that include (1) the ultimate sale proceeds of Debtors' assets; and (2) the uncertainty of recovery of money from pursuit of Chapter 5 and other claims by the Liquidation Estate.

The Committee estimates, however, that the Settlement may result in approximately $2 million to $2.4 million available for distribution from the Collateral Account, assuming expeditious confirmation of the Plan and favorable resolution of disputes with holders of Classes 1C, and 1D, claims, less $1 million paid under the WARN Settlement to Class 2A. RubinBrown estimates net Avoidance Action proceeds may exceed $3 million, so as to potentially provide a $2.75 million pool of funds for payment of general unsecured claims, after subtracting $250,000 to be paid WARN claims from Avoidance Action proceeds.

386763.3

## CONCLUSION

The materials and information provided with this Disclosure Statement are to assist you in voting on the Plan of Liquidation proposed by the Committee. If the Plan is confirmed, you shall be bound by its terms. Accordingly, you are urged to carefully review this Disclosure Statement and the attached Plan and to make any inquiries you believe are needed to cast an informed vote on the Plan.

Dated: August 13, 2009.

SPENCER FANE BRITT & BROWNE

Daniel D. Doyle (MO 36724, EDMO 3011)
ddoyle@spencerfane.com
Laura M. Hughes (MO 60732)
1 North Brentwood Boulevard, Tenth Floor
St. Louis, MO 63105
Telephone: (314) 863-7733
Fax: (314) 862-4656

ATTORNEYS FOR THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS

386763.3